UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN DOE, 18-471 et al.<br><br>     Plaintiffs,<br><br>v.<br><br>STATE OF TENNESSEE,<br><br>     Defendants. | Case No. 3:18-cv-00471<br><br>Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:     The Honorable William L. Campbell, Jr., District Judge

## REPORT AND RECOMMENDATION

Pro se Plaintiff John Doe's claims in this action arise out of his divorce and child custody proceedings in Tennessee state courts. (Doc. No. 23.) This Court previously found that it lacked jurisdiction to consider Doe's claims under the domestic-relations exception to federal question jurisdiction and dismissed each of the ten counts of Doe's amended complaint. (Doc. Nos. 112, 117.) Doe appealed, and the United States Court of Appeals for the Sixth Circuit affirmed dismissal of Counts 1–5 and 8–10, but vacated dismissal of Counts 6 and 7, which are claims for injunctive relief and monetary damages under Title II of the Americans with Disabilities Act (ADA). (Doc. Nos. 23, 126.) The Sixth Circuit dismissed the requests for injunctive relief in Counts 6 and 7 as moot and remanded Doe's requests for monetary damages for the limited purpose of determining whether Eleventh Amendment sovereign immunity or any other threshold ground bars the award of damages against Defendants the State of Tennessee; the Chancery Court of Dickson County, Tennessee (the Chancery Court); Chancellor David Wolfe; the General Sessions Court of Dickson County, Tennessee (the General Sessions Court); and General Sessions Judge Craig Monsue.

(Doc. No. 126.) The parties have filed supplemental briefing on this question (Doc. Nos. 140, 142, 151, 153) and the issue is ripe for the Court's review.

For the reasons that follow, the Magistrate Judge will recommend the Court find that sovereign immunity bars Doe's claims for monetary damages in Counts 6 and 7 and dismiss those claims without prejudice for lack of jurisdiction.

## I.        Relevant Background

The Court has discussed the factual and procedural background of this action in prior orders and will summarize the background relevant to Counts 6 and 7 here.

### A.        Factual Background

Doe alleges that he was hospitalized for depression and suicidal thoughts in February 2018. (Doc. No. 23.) Following his hospitalization, he informed his then-wife Jane Doe that he wanted a divorce. (*Id.*) Jane Doe filed a petition in the General Sessions Court seeking a protective order against Doe on behalf of herself and the couple's children. (*Id.*) Her petition detailed episodes of violence by Doe and described Doe's mental health and recent hospitalization. (*Id.*; Doc. No. 23-1.) Based on Jane Doe's petition, Monsue issued an ex parte order prohibiting Doe from having any contact with Jane Doe or their three minor children pending an evidentiary hearing on the petition. (Doc. No. 23.)

Monsue held an evidentiary hearing on the petition approximately three weeks after it was filed. (*Id.*) During the hearing, witnesses for Jane Doe testified about Doe's mental health, and Jane Doe's counsel argued "that[,] because of John Doe's mental health diagnosis and medications, no one could know for sure if [he] was safe to be around the children . . . ." (*Id.* at PageID# 252–53, ¶ 39.) After the hearing, Monsue found that Jane Doe had proven her allegations of abuse by a preponderance of the evidence and issued a protective order prohibiting Doe from having any contact with Jane Doe or the children. (Doc. No. 23.) Doe appealed the protective order to the

2

Chancery Court and moved for his own protective order against Jane Doe. (*Id.*) According to Doe, the Chancery Court took no action regarding his appeal or his motion for a protective order. (*Id.*)

While Jane Doe's petition for a protective order was pending in the General Sessions Court, Doe filed for divorce in the Chancery Court. (*Id.*) Jane Doe filed a proposed parenting plan, and Doe filed a motion for a temporary custody and visitation order. (*Id.*) Doe also filed "a notice of disability under the Americans with Disabilities Act," informing the Chancery Court that he had been diagnosed with major depression and "asking the court not to discriminate against" him because of that diagnosis. (*Id.* at PageID# 255, ¶ 52.)

Wolfe held a hearing in the divorce proceedings regarding temporary visitation, among other legal issues. (Doc. No. 23.) Doe alleges that Jane Doe's counsel and Wolfe mocked Doe's notice of disability in the hearing. (*Id.*) Wolfe ordered the appointment of a guardian ad litem for the children and adjourned the hearing to allow the guardian time to become familiar with the case. (*Id.*) He declined to rule on Doe's pending motions and "directed the parties to the hallway to negotiate supervised visitation." (*Id.* at PageID# 255, ¶¶ 55, 56.) Wolfe also ordered Doe to undergo a mental-health evaluation as authorized by Tennessee Rule of Civil Procedure 35 and ordered the Does and their children to undergo a family evaluation. (Doc. No. 23.) As a result of the parties' negotiations, Doe was allowed to visit his children for two hours every other week while supervised by Jane Doe's sister and brother-in-law. (*Id.*) Jane Doe's sister and brother-in-law later informed the Chancery Court that they would not continue supervising Doe's visits with his children, and Wolfe ordered Doe to hire a professional visitation supervisor at his own expense. (*Id.*)

Doe's mental-health evaluation was completed and filed with the Chancery Court in early July 2018. (*Id.*) The report stated that treatment and medication were mitigating Doe's anger and

depression. (*Id.*) Doe filed another motion for a temporary custody and visitation order soon thereafter alleging that, during a hearing, Wolfe had stated that the ADA did not apply to divorce and custody proceedings and expressed concern about Doe's mental health and the Rule 35 evaluation. (*Id.*) Doe further states that Wolfe was openly dismissive of Doe, refused to hear from Doe's witnesses, and adjourned the hearing pending the results of the family evaluation. (*Id.*)

Doe alleges that, as of the date of filing his amended complaint, he "spent 69 days with *no contact* with his minor children," then received only 10 hours of supervised visitation over a 7-week period, then went another "44 days with no contact." (*Id.* at PageID# 258, ¶ 73.)

### B. Procedural History

Doe initiated this action on May 18, 2018 (Doc. No. 1), while his divorce was ongoing (Doc. No. 23). Doe's amended complaint asserts a variety of claims on behalf of Doe and his minor children. (Doc. No. 23.) As relevant here, Count 6 claims that Defendants the State of Tennessee, the Chancery Court, Wolfe, the General Sessions Court, and Monsue deprived Doe of "fundamental parenting rights" under the United States Constitution in violation of Title II of the ADA "based on the prohibited rationale of stereotypical and unspecified fear relative to his mental health diagnosis." (*Id.* at PageID# 267.) Count 7 alleges that the same defendants violated Doe's children's rights under the ADA by "depriving them of visitation and contact with their father, an activity constituting a fundamental liberty interest." (*Id.* at PageID# 268.) Doe seeks injunctive relief and monetary damages for both counts. (Doc. No. 23.)

The defendants moved to dismiss Doe's amended complaint arguing that the Court lacked jurisdiction to consider Doe's claims and, in the alternative, that Doe had failed to state any claims for which relief could be granted. (Doc. Nos. 34, 83, 100.) Doe did not object to the dismissal of his claims against Jane Doe but otherwise opposed the defendants' motions. (Doc. Nos. 53, 99, 102.) The Court granted the defendants' motions to dismiss, finding that it lacked subject-matter

jurisdiction over Doe's federal claims because his amended complaint, at its core, sought to modify the state courts' child-custody orders, and that the Court should decline to exercise jurisdiction over any state-law claims. (Doc. Nos. 112, 117.)

Doe appealed (Doc. No. 122), and the Sixth Circuit affirmed this Court's dismissal of Counts 1–5 and 8–10 but vacated the Court's dismissal of Counts 6 and 7 (Doc. No. 126). The Sixth Circuit held that Doe's requests for injunctive relief in Counts 6 and 7 were moot, that Doe "retain[ed] a legally cognizable interest in Counts 6 and 7 because of his request for money damages[,]" and that this Court "erred in holding that the domestic-relations exception [to federal-question jurisdiction] barred these claims . . . [for] money damages . . . ." (*Id.* at PageID# 796.) However, the Sixth Circuit further held that

> sovereign immunity *may* bar consideration of Counts 6 and 7. Because Doe seeks relief in these counts against the state of Tennessee, two state courts, and state officials acting in their official capacities, sovereign immunity would ordinarily deprive the district court of jurisdiction. Congress, however, has validly abrogated state sovereign immunity for some violations of Title II of the ADA. *See Babcock v. Michigan*, 812 F.3d 531, 534–35 (6th Cir. 2016). We think it best for the district court to consider in the first instance whether Counts 6 and 7 fall within the scope of the ADA's valid abrogation of sovereign immunity.

(*Id.* at PageID# 797.) The Sixth Circuit therefore remanded Counts 6 and 7 for consideration of the sovereign immunity question and further instructed that, "[o]n remand, the district court should also consider whether any other 'threshold grounds for denying audience to [these claims] on the merits' apply." (*Id.* (second alteration in original) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).)

On remand, this Court ordered the parties to file supplemental briefs addressing the question posed by the Sixth Circuit—"whether sovereign immunity or other threshold reasons bar this Court's consideration of the claims for monetary damages in Counts 6 and 7 of the amended complaint." (Doc. No. 136, PageID# 890.) The State, the Chancery Court, and Wolfe argue that

5

they are entitled to Eleventh Amendment sovereign immunity from Doe's monetary damages claims in Counts 6 and 7 because, under the three-part test established by *United States v. Georgia*, 546 U.S. 151, 159 (2006), Congress has not validly abrogated state sovereign immunity with respect to Doe's or his children's Title II claims. (Doc. No. 140.) Relying on the Supreme Court's opinion in *Tennessee v. Lane*, 541 U.S. 509 (2004), and the Sixth Circuit's opinion in *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808 (6th Cir. 2002) (en banc) (*Popovich I*), Doe responds that Congress has validly abrogated state sovereign immunity with respect to the violations of fundamental rights protected by the Due Process Clause of the Fourteenth Amendment that he asserts in Counts 6 and 7. (Doc. No. 142.) The State, the Chancery Court, and Wolfe did not file a reply.

The General Sessions Court and Monsue argue that they are considered arms of the state for purposes of sovereign immunity, that the claims against them are therefore duplicative of Doe's claims against the State of Tennessee, and that they are entitled to sovereign immunity because, under the *Georgia* test, Congress has not validly abrogated state sovereign immunity with respect to Title II claims. (Doc. No. 151.) Doe argues that the General Sessions Court and Monsue should not be considered arms of the state and are not entitled to sovereign immunity. (Doc. No. 153.) Alternatively, Doe argues that the General Sessions Court and Monsue waived any sovereign immunity argument by failing to raise it in their motion to dismiss his amended complaint and that Congress validly abrogated state sovereign immunity with respect to the Title II claims in Counts 6 and 7. (*Id.*) The General Sessions Court and Monsue also did not file a reply.

## II.     Legal Standard

Federal courts are courts of limited jurisdiction and can adjudicate only the claims that the Constitution or an act of Congress has authorized them to hear. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 (6th Cir. 2012). Whether a court has subject-matter jurisdiction is a

"threshold" question in any action, *Am. Telecom Co. v. Republic of Leb.*, 501 F.3d 534, 537 (6th Cir. 2007), and one that courts may raise sua sponte, *In re Lewis*, 398 F.3d 735, 739 (6th Cir. 2005). This reflects the fundamental principle that "'[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

A challenge to subject-matter jurisdiction "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). "A state's assertion of sovereign immunity constitutes a factual attack." *Hornberger v. Tennessee*, 782 F. Supp. 2d 561, 564 (M.D. Tenn. 2011). In resolving assertions of sovereign immunity, no presumption of truth applies to the plaintiff's factual allegations, and the "court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). District courts reviewing factual attacks on jurisdiction have "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

An entity asserting Eleventh Amendment sovereign immunity "has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002); *see also Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) (quoting *id.*).

### III.     Analysis

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or

Subjects of any Foreign State." U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a state by citizens of another state, the Supreme Court has extended it to suits by citizens against their own states." *Babcock*, 812 F.3d at 533 (citing *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)). Eleventh Amendment "immunity applies only to lawsuits against the State or 'an arm of the State,' not to those against political subdivisions like counties." *Laborers' International Union, Local 860 v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)); *see also Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005). As relevant here, the Supreme Court has held that Congress may abrogate states' Eleventh Amendment immunity under certain circumstances and that it has done so with respect to some Title II ADA claims. *Lane*, 541 U.S. at 517; *Georgia*, 546 U.S. at 159.

The Court will therefore analyze whether the Chancery Court, Wolfe, the General Sessions Court, and Monsue are arms of the State of Tennessee for purposes of Eleventh Amendment immunity before determining whether Doe's and his children's claims for monetary damages in Counts 6 and 7 fall within the scope of the ADA's valid abrogation of sovereign immunity.

### A.     The Arm of the State Analysis

Doe sues Wolfe in his official capacity as a chancellor and Monsue in his official capacity as a judge. (Doc. No. 23.) "[F]or the purpose of sovereign immunity[,] 'individuals sued in their official capacities stand in the shoes of the entity they represent.'" *S.J. v. Hamilton Cnty.*, 374 F.3d 416, 420 (6th Cir. 2004) (quoting *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003)). Thus, the relevant inquiry is whether the Chancery Court and General Sessions Court are considered arms of the State of Tennessee for purposes of the Eleventh Amendment. The Sixth Circuit directs courts to apply four factors in making that determination:

(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Ernst*, 427 F.3d at 359 (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44–45 (1994)).

The analysis is made based on the law of the state in question.

The first factor is "generally . . . the most important one, . . . [but] it is not 'the sole criterion for determining whether an [entity] is a state entity for sovereign immunity purposes.'" *Id.* (quoting *S.J.*, 374 F.3d at 421). This is especially so when the entities in question are state courts. *See Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 761 (6th Cir. 2010) (holding that district court erred "[i]n concluding that potential financial liability is the only determinative factor—or the near-determinative factor—in establishing whether a state court is an arm of the state for purposes of Eleventh Amendment sovereign immunity"); *Laborers' International Union, Local 860*, 29 F.4th at 333 ("That the State has delegated some funding responsibility to a local government does not cancel out the State's extensive authority over the Juvenile Court."). The "need to inquire beyond the issue of financial liability relates back to the Supreme Court's emphasis that the Eleventh Amendment incorporates 'twin reasons' for granting states sovereign immunity: the desire not to infringe either a state's purse or its dignity." *Pucci*, 628 F.3d at 761 (quoting *Hess*, 513 U.S. at 47); *see also id.* ("Sovereign immunity . . . 'does not exist solely in order to prevent federal-court judgments that must be paid out of a State's treasury; it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" (quoting *Seminole Tribe v. Florida*, 517 U.S. 44, 58 (1996))).

## 1.    The Chancery Court

The Sixth Circuit held that sovereign immunity barred Doe's claim for injunctive relief against the Chancery Court and Wolfe in Count 10 because "[t]he Chancery Court is an arm of the

[S]tate of Tennessee." (Doc. No. 126, PageID# 795 (citing *Pucci*, 628 F.3d at 762).) Although the Sixth Circuit did not directly address the *Ernst* factors, applying those factors to Tennessee law directs this Court to the same conclusion.[1]

First, Tennessee law provides that chancellors are officers of the state whose salaries and expenses are paid out of the state treasury. Tenn. Code Ann. §§ 8-23-103, 8-23-104, 8-26-101. Thus, Tennessee is potentially liable for judgments against chancellors in their official capacities, and the first *Ernst* factor therefore weighs in favor of finding that chancery courts are arms of the state entitled to Eleventh Amendment sovereign immunity. *See Ernst*, 427 F.3d at 359 ("[I]t is the state treasury's *potential* legal liability for the judgment, not whether the state treasury will pay for

---

[1]     Doe has not contested the conclusion that the Chancery Court and Wolfe are arms of the state. The State, the Chancery Court, and Wolfe argue in a footnote that chancery courts are arms of the state for Eleventh Amendment purposes, but do not address the *Ernst* factors. (Doc. No. 140.) Instead, these defendants rely on the Sixth Circuit's opinion in *Howard v. Virginia*, 8 F. App'x 318, 319 (6th Cir. 2001), for the general principle that "[a] state court, such as the chancery court here, 'is an arm of the state, entitled to Eleventh Amendment immunity.'" (*Id.* at PageID# 916 n.6.) In *Howard*, the Sixth Circuit upheld a district court's finding that the Commonwealth of Virginia 12th Judicial District Court was entitled to Eleventh Amendment immunity. 8 F. App'x at 319. *Howard* cited the Sixth Circuit's opinion in *Mumford v. Basinski*, 105 F.3d 264, 267–70 (6th Cir. 1997), a pre-*Ernst* decision that analyzed Ohio law and held that the Lorain County Common Pleas Court Domestic Relations Division was an arm of the State of Ohio entitled to sovereign immunity. *Id.*

The Sixth Circuit has applied the *Ernst* factors in cases addressing the status of state courts in Michigan and Ohio and held, based on Michigan and Ohio law, that Michigan's trial-level district courts and the juvenile divisions of Ohio's courts of common pleas are considered arms of the state for sovereign immunity purposes. *See Pucci*, 628 F.3d at 761–64 (Michigan trial-level district courts are arms of the state entitled to Eleventh Amendment immunity); *Laborers' International Union, Local 860*, 29 F.4th at 330–34 (Ohio courts of common pleas juvenile divisions are arms of the state entitled to Eleventh Amendment immunity). The Sixth Circuit has not yet examined the *Ernst* factors with respect to Tennessee's laws governing its chancery and general sessions courts.

the judgment in *that* case, that controls the inquiry[.]" (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997))).

The Sixth Circuit has held that the second *Ernst* factor—"the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions," *Ernst*, 427 F.3d at 459—weighs in favor of sovereign immunity when states treat their courts "as segments of state government." *Laborers' International Union, Local 860*, 29 F.4th at 330. In *Pucci* and *Laborers' International Union, Local 860*, the Sixth Circuit considered, among other things, that Michigan law and Ohio law create unified state judicial systems under the control of the states' supreme courts and vest the states' judicial power in their lower courts. *Pucci*, 628 F.3d at 762–63; *Laborers' International Union, Local 860*, 29 F.4th at 330–31. The same is true of Tennessee.

The Tennessee General Assembly has "granted and clothed" "the supreme court" "with general supervisory control over all the inferior courts of the state" "[i]n order to ensure the harmonious, efficient and uniform operation of the judicial system of the state[.]" Tenn. Code Ann. § 16-3-501. It has also empowered the Tennessee Supreme Court to "[d]irect the administrative director of the courts to provide administrative support to all of the courts of the state[.]" *Id.* § 16-3-502(3). Like the Michigan Constitution and the Ohio Constitution, the Tennessee Constitution vests "[t]he judicial power of this State . . . in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish" and "in the Judges thereof[.]" Tenn. Const. art. 6, § 1. Tennessee law further provides that "[t]he judicial power of the state is vested in judges of the . . . chancery courts," among "other courts created by law." Tenn. Code Ann. § 16-1-101. In *Laborers' International Union, Local 860*, the Sixth Circuit also found significant that the judges of the state court at issue have the "authority to serve

temporarily throughout Ohio's lower court system if circumstances require" and "take an oath to support the Ohio Constitution." 29 F.4th at 331, 333 (first citing Ohio Const. art. IV, § 5(A)(3); and then citing Ohio Rev. Code Ann. § 3.23). Similarly, the Tennessee Supreme Court may "[d]esignate and assign temporarily any judge or chancellor to hold or sit as a member of any court, of comparable dignity or equal or higher level, for any good and sufficient reason." Tenn. Code Ann. § 16-3-502(3)(A). And, "[b]efore entering upon the duties of office, every judge and chancellor" must "take an oath or affirmation to support the constitutions of the United States and of the State of Tennessee. *Id.* § 17-1-104. The second *Ernst* factor favors finding the Chancery Court to be an arm of the state. *Ernst*, 427 F.3d at 459; *see also Pucci*, 628 F.3d at 762–63; *Laborers' International Union, Local 860*, 29 F.4th at 330–31.

The third *Ernst* factor asks "whether state or local officials appoint the board members of the entity[.]" *Ernst*, 427 F.3d at 459. The State of Tennessee exercises considerable control over the selection and removal of chancellors. In *Pucci* and *Laborers' International Union, Local 860*, the Sixth Circuit considered that Michigan law and Ohio law provide that, even though judges of the courts at issue were elected locally, state officials held removal power and the power to fill judicial vacancies. *Pucci*, 628 F.3d at 763; *Laborers' International Union, Local 860*, 29 F.4th at 331. The Sixth Circuit also considered that the Ohio Constitution "dictates standards controlling the election, residency, tenure, compensation, and eligibility of every . . . judge." *Laborers' International Union, Local 860*, 29 F.4th at 331 (quoting *Mumford v. Basinski*, 105 F.3d 264, 268 (6th Cir. 1997)). Tennessee law provides that chancellors are elected by voters in the judicial districts where they sit and are subject to age, residency, and professional qualifications set by state law. Tenn. Const. art. 6, § 4; Tenn. Code Ann. §§ 17-1-101–17-1-107. Chancellors may only be removed by a two-thirds vote of both houses of the state legislature. Tenn. Const. art. 6, § 6. If

a chancellor vacancy occurs "by death, resignation, retirement, or otherwise," state law provides that "the governor shall fill the vacancy by appointing one (1) of three (3) persons nominated by the [trial court vacancy] commission." Tenn. Code Ann. § 17-4-308(a). The third *Ernst* factor weighs in favor of finding that the Chancery Court is an arm of the state. *Ernst*, 427 F.3d at 459; *see also Pucci*, 628 F.3d at 763–64; *Laborers' International Union, Local 860*, 29 F.4th at 331.

The fourth *Ernst* factor is easily met. "[S]tate courts quintessentially fall within the 'traditional purview of state government.'" *Laborers' International Union, Local 860*, 29 F.4th at 331 (quoting *Pucci*, 628 F.3d at 764). The Sixth Circuit has held that "[t]he state judiciary is 'one of three essential branches of state government'" and that "state courts serve as the State's 'adjudicative voice.'" *Id.* (first quoting *Ernst*, 427 F.3d at 361; and then quoting *S.J.*, 374 F.3d at 421). "If any entity qualifies as an arm of the State, a state court does." *Id.*; *see also Lane*, 541 U.S. at 527 n.16 ("[T]he provision of judicial services[ is] an area in which local governments are typically treated as 'arm[s] of the State' for Eleventh Amendment purposes[.]" (third alteration in original) (quoting *Mt. Healthy City Bd. of Ed.*, 429 U.S.at 280)).

All four *Ernst* factors thus direct the Court to find the Chancery Court to be an arm of the State of Tennessee for Eleventh Amendment purposes. *Cf. Pucci*, 628 F.3d at 764; *Laborers' International Union, Local 860*, 29 F.4th at 331–32 (collecting cases holding "that the courts in a State's third branch of government count as arms of the State").

### 2. The General Sessions Court

The Sixth Circuit did not address whether the Court of General Sessions is considered an arm of the state for purposes of Eleventh Amendment sovereign immunity and, on remand, the

parties have not addressed how the *Ernst* factors apply to Tennessee's general sessions courts.[2] The Court of General Sessions and Monsue argue (Doc. No. 151) that general sessions courts are arms of the state for purposes of Eleventh Amendment immunity because the Supreme Court held in *Lane* that "the provision of judicial services" is "an area in which local governments are typically treated as 'arm[s] of the State' for Eleventh Amendment purposes, and thus enjoy precisely the same immunity from unconsented suit as the States." *Lane*, 541 U.S. at 527 n.16 (alteration in original) (quoting *Mt. Healthy City Bd. of Ed.*, 429 U.S. at 280). Doe argues that "[t]he General Sessions Court is a county entity under state law" that is not entitled to Eleventh Amendment immunity and, in the alternative, that these defendants have waived sovereign immunity by failing to raise it in their motion to dismiss Doe's amended complaint. (Doc. No. 153, PageID# 991.)

The defense of sovereign immunity is subject to waiver. *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). However, even if the General Sessions Court and Monsue waived that defense by failing to raise it in their motion to dismiss, it is well established that courts may consider Eleventh Amendment sovereign immunity sua sponte. *See, e.g.*, *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008); *Nair*, 443 F.3d at 474. In this case, the Sixth Circuit has directed this Court to consider whether sovereign immunity bars Doe's and his children's Title II claims for monetary damages against the General Sessions Court and Monsue. (Doc. No. 126.)

Tennessee laws governing general sessions courts differ slightly from its laws concerning chancery courts. The primary difference, for purposes of the *Ernst* factors, is how the courts are funded. While Tennessee law sets a base salary for general sessions judges, Tenn. Code Ann. § 16-

---

[2]     The Sixth Circuit did, however, characterize the General Sessions Court as a "state court[ ]" and Monsue as a "state official[ ][.]" (Doc. No. 126, PageID# 797.)

15-5003, counties are responsible for paying general sessions judges' salaries and for funding the general sessions courts, *id.* §§ 16-15-102, 16-15-50006. The first *Ernst* factor therefore weighs against finding that general sessions courts are arms of the state. *Pucci*, 628 F.3d at 761–62, 764; *Laborers' International Union, Local 860*, 29 F.4th at 330, 331–32.

Turning to the second factor, the State of Tennessee treats general sessions courts as segments of state government. As explained, Tennessee law creates a unified state judicial system under the control, supervision, and administration of the Tennessee Supreme Court. *See* Tenn. Code Ann. § 16-3-501. ("In order to ensure the harmonious, efficient and uniform operation of the judicial system of the state, the supreme court is granted and clothed with general supervisory control over all the inferior courts of the state."). The Tennessee Legislature created general sessions courts and retains the sole authority to abolish them. Tenn. Code Ann. § 16-15-101(a)–(b). Tennessee law vests the state's judicial power in the general sessions courts and general sessions judges. Tenn. Const. art. 6, § 1; Tenn. Code Ann. § 16-1-101. General sessions judges take the same oath as chancellors, swearing to uphold the United States Constitution and Tennessee Constitution. Tenn. Code Ann. §§ 16-15-203, 17-1-104. And the Supreme Court may temporarily assign a general sessions judge to "sit as a member of any court" in the state. *Id.* § 16-3-502; *see also Laborers' International Union, Local 860*, 29 F.4th at 331 (Ohio juvenile court judges are "judge[s] of the State, complete with authority to serve temporarily throughout Ohio's lower court system if circumstances require"). The second *Ernst* factor therefore favors finding the General Sessions Court to be an arm of the state. *See Pucci*, 628 F.3d at 762–63; *Laborers' International Union, Local 860*, 29 F.4th at 330–31.

Like chancellors, general sessions judges are elected subject to qualifications set by state law, Tenn. Code Ann. §§ 16-15-201, 16-15-202, 17-1-106, and may only be removed by a two-

thirds vote of both houses of the state legislature, Tenn. Const. art. 6, § 6; *see also In re Murphy*, 726 S.W.2d 509, 510–11 (1987) (holding that Tennessee Constitution vests power of removal of general sessions judges exclusively in Tennessee Legislature). However, state law provides that county legislative bodies fill vacancies on the general sessions courts. Tenn. Code Ann. § 16-15-210. Even considering this difference, however, the third *Ernst* factor tips in favor of finding that general sessions courts are arms of the state.

For the reasons explained above, the fourth factor—whether the entity's actions fall within the traditional purview of state or local governments—weighs heavily in favor of finding that general sessions courts are arms of the state for Eleventh Amendment purposes, as it does for all state courts. *See Laborers' International Union, Local 860*, 29 F.4th at 331 ("[S]tate courts quintessentially fall within the 'traditional purview of state government.'" (quoting *Pucci*, 628 F.3d at 764)); *id.* ("If any entity qualifies as an arm of the State, a state court does.").

Considering the four *Ernst* factors, the Court finds that the fact that counties may be liable for judgments against general sessions courts "is outweighed by the integrated role of" the general sessions courts within Tennessee's judiciary, "the degree of supervision and control that the [Tennessee] Supreme Court and legislature exercise over those courts," the role state actors play in selecting and removing general sessions judges, and the traditional state function the general sessions courts carry out. *Pucci*, 628 F.3d at 764; *see also Laborers' International Union, Local 860*, 29 F.4th at 333 ("That the State has delegated some funding responsibility to a local government does not cancel out the State's extensive authority over the Juvenile Court. The courts of common pleas remain creatures of the Ohio Constitution and state statute and remain the third

branch of *state* government."). This Court should therefore find that the Court of General Sessions is an arm of the state for purposes of Eleventh Amendment sovereign immunity.[3]

Because the Chancery Court and General Sessions Court—and Wolfe and Monsue acting in their official capacities—are arms of the State of Tennessee for purposes of the Eleventh Amendment, the Court must determine whether sovereign immunity bars Doe's and his children's Title II claims for monetary damages against these defendants.

### B. The ADA's Abrogation of Sovereign Immunity

Congress may abrogate Eleventh Amendment sovereign immunity where it (1) unequivocally expresses its intent to abrogate state sovereign immunity; and (2) acts pursuant to a valid grant of constitutional authority. *See, e.g.*, *Lane*, 541 U.S. at 517 (collecting cases). The first requirement is not at issue in this case. The ADA provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202 (footnote omitted). The Supreme Court has held that this provision unequivocally expresses Congress's intent to abrogate states' Eleventh Amendment sovereign immunity for any claims brough under the ADA. *Garrett*, 531 U.S. at 363–64; *Lane*, 541 U.S. at 518 (same).

---

[3] One federal court in Tennessee reached the opposite conclusion. In *Culbertson v. Sullivan County Sheriff's Department*, 2:20-CV-00083, 2020 WL 6365437 (E.D. Tenn. Oct. 29, 2020), the court observed that "counties are responsible for general sessions courts" and therefore found that "a general sessions court would not be an arm of the state, and the general sessions judge would be a county office, not a state official." *Id.* at *3 (citation omitted). But the *Culbertson* court did not consider the second, third, and fourth *Ernst* factors in making this finding and, as explained above, these factors outweigh the counties' financial responsibility for the general sessions courts. Further, the *Culbertson* court's finding was dicta. *See id.* ("But regardless of this technical difference, it does not change the conclusion. Plaintiff has not alleged anything improper anyone with the 'Kingsport City Courts' did to violate his constitutional rights. Aside from the immunity issues, he simply has not stated a claim under Section 1983 for which relief can be granted.").

17

As for the second requirement, "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Lane*, 541 U.S. at 518 (discussing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). Section 5 of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Section 1 provides the following substantive guarantees:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

*Id.* § 1. The Supreme Court has held that, "[w]ith only 'a handful' of exceptions, . . . the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 764–65 (2010)). Congress's power to enforce these rights is broad but not unlimited. *Lane*, 541 U.S. at 520. "While Congress must have a wide berth in devising appropriate remedial and preventative measures for unconstitutional actions, those measures may not work a 'substantive change in the governing law.'" *Id.* (quoting *City of Boerne v. v. Flores*, 521 U.S. 507, 519 (1997)). The Supreme Court has therefore held that "Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Id.* (quoting *City of Boerne*, 521 U.S. at 520).

### 1. Title II of the ADA

Title II addresses discrimination on the basis of disability in the provision of public services. 42 U.S.C. §§ 12131–12165. It provides that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual;" "a record of such an impairment; or" "being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1)(A)–(C). Title II defines a "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2). A public entity is "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" *Id.* § 12131(1)(A)–(B). This includes "the legislative and judicial branches of State and local governments." 28 C.F.R. pt. 35, app. B. Title II does not define "services," "programs," or "activities," but the Sixth Circuit has held that these terms are to be construed broadly and "encompass[ ] virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Further, the Sixth Circuit has held that "Title II . . . encompass[es] a prohibition against associational discrimination[.]" *Popovich v. Cuyahoga Cnty. Ct. of Common Please, Domestic Rels. Div.*, 150 F. App'x 424, 426 (6th Cir. 2005) (*Popovich II*); *see also MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334–35 (6th Cir. 2002). Title II's implementing regulations provide that "a public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g).

In *Tennessee v. Lane*, the Supreme Court considered whether Title II is a valid exercise of Congress's § 5 enforcement power with respect to the particular claims presented in that case. *Id.* at 522. The plaintiffs in *Lane* were individuals who used wheelchairs for mobility; they "claimed that they were denied access to, and the services of, the state court system by reason of their disabilities." *Id.* at 513. Specifically, one plaintiff "alleged that he was compelled to appear to answer a set of criminal charges on the second floor of a county courthouse that had no elevator." *Id.* He "crawled up two flights of stairs to get to the courtroom" for his first appearance, but "refused to crawl again or to be carried by officers to the courtroom" for a second appearance and "was arrested and jailed for failure to appear." *Id.* at 514. A second plaintiff, who was "a certified court reporter, alleged that she ha[d] not been able to gain access to a number of county courthouses, and, as a result, ha[d] lost both work and an opportunity to participate in the judicial process." *Id.* In addressing these plaintiffs' claims, the Supreme Court considered "whether Congress had the power under § 5 to enforce the constitutional right of access to the courts." *Id.* at 531. After considering Congressional findings regarding pervasive disability discrimination in state services and programs—including evidence "that many individuals in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities" *id.* at 527—the Court held "that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation" *id.* at 529. It therefore "concluded that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533–34.

"The holding in *Lane* was fairly narrow: that 'Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services.'" *Meeks v.*

*Schofield*, 10 F. Supp. 3d 774, 793 (M.D. Tenn. 2014) (quoting *Lane*, 541 U.S. at 531). While the Supreme Court recognized that Title II "seeks to enforce a variety of other basic constitutional guarantees," it did not determine in *Lane* whether Congress's abrogation of sovereign immunity in the ADA is valid with respect to other constitutional rights. *Lane*, 541 U.S. at 522; *see also Georgia*, 546 U.S. at 161 (Stevens, J., concurring) ("*Lane* . . . identified a constellation of 'basic constitutional guarantees' that Title II seeks to enforce and ultimately evaluated whether Title II was an appropriate response to the 'class of cases' at hand." (quoting *Lane*, 541 U.S. at 522, 531)).

Approximately two years after deciding *Lane*, the Supreme Court again considered the validity of the ADA's abrogation of state sovereign immunity for particular Title II claims in *United States v. Georgia*. 546 U.S. at 157–60. The plaintiff in *Georgia* was an individual incarcerated in a Georgia prison who alleged claims against the state and state officials under 42 U.S.C. § 1983 for violations of his Eight Amendment rights and under Title II of the ADA for disability-related discrimination. *Id.* at 154–55. The district court dismissed the plaintiff's § 1983 claims for failure to state a claim on which relief could be granted and found that sovereign immunity barred the plaintiff's Title II claims for monetary damages. *Id.* at 155. The United States Court of Appeals for the Eleventh Circuit reversed the district court's dismissal of the plaintiff's § 1983 claims, holding that the plaintiff "had alleged actual violations of the Eighth Amendment by state agents . . .[,]" but "affirmed the District Court's holding that [the plaintiff's] Title II claims for money damages against the State were barred by sovereign immunity." *Id.* at 156, 157.

In the Supreme Court, the plaintiff argued, and the state did not dispute, that his Title II claims were based on the same conduct that gave rise to his Eighth Amendment claims. *Id.* at 157. The Supreme Court observed that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [the plaintiff's] disability-related needs in such fundamentals as

21

mobility, hygiene, medical care, and virtually all other prison programs constituted" violations of the Eighth Amendment and Title II of the ADA. *Id.* The Supreme Court therefore held that the plaintiff's "claims for money damages against the State under Title II were evidently based, at least in part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment" because "the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment[ ]." *Id.* (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947)). The Supreme Court continued:

> While the Members of this Court have disagreed regarding the scope of Congress's 'prophylactic' enforcement powers under § 5 of the Fourteenth Amendment, no one doubts that § 5 grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions.

*Id.* (second alteration in original) (citations omitted).

The Supreme Court therefore held that, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159. The Supreme Court found that the lower courts would "be best situated to determine" what, if any, actual Fourteenth Amendment violations the plaintiff had alleged. *Id.* To aid the lower courts, the Supreme Court articulated a three-part test for determining whether the ADA's abrogation of sovereign immunity is valid with respect to a plaintiff's Title II claims. *Id.* Under that test, courts must "determine . . . , on a claim-by-claim basis":

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.* The Sixth Circuit has adopted the *Georgia* test for "assessing whether the Eleventh Amendment proscribes an ADA Title II claim[.]"[4] *Babcock*, 812 F.3d at 534. This Court must therefore determine the nature of the conduct that gives rise to the claims Doe alleges in Counts 6 and 7.

Count 6 of Doe's amended complaint alleges that the State, the General Sessions Court, Monsue, the Chancery Court, and Wolfe "violat[ed] Title II of the Americans with Disabilities Act" because they "deprived John Doe of his fundamental parenting rights, protected by § 5 of the 14th Am[endment] of the U.S. Constitution, based on the prohibited rationale of stereotypical and unspecified fear relative to his mental health diagnosis." (Doc. No. 23, PageID# 267.) Count 7 alleges that the same defendants

> violated the rights of [the Doe children] solely because they are related to John Doe, a qualified individual with a disability, specifically depriving them of visitation and contact with their father, an activity constituting a fundamental liberty interest, protected by § 5 of the 14th Amendment to the Constitution, Title II of the ADA, and 28 C.F.R. § 35.130(g).

(*Id.* at PageID# 268.) Doe argues that the Court need not apply the *Georgia* test to these claims because the Supreme Court in *Lane* and the Sixth Circuit in *Popovich I* have already held that "Title II of the ADA abrogates state sovereign immunity to protect the fundamental rights involved in child custody cases." (Doc. No. 142, PageID# 935.)

But the cases on which Doe relies do not reach that conclusion. The Supreme Court's holding in *Lane* was limited "'to the class of cases implicating the *accessibility* of judicial services.'" *Meeks*, 10 F. Supp. 3d at 793 (emphasis added) (quoting *Lane*, 541 U.S. at 531); *see also Lane*, 541 U.S. at 533–34 ("Title II, as it applies to the class of cases implicating the

---

[4]    The Sixth Circuit has also held that "an alleged violation of the Equal Protection Clause based on heightened scrutiny as a member of a suspect class, as opposed to an alleged Due Process Clause violation, cannot serve as a basis for Title II liability." *Babcock*, 812 F.3d at 534 (first citing *Popovich I*, 276 F.3d at 812; and then citing *Mingus v. Butler*, 591 F.3d 474, 483 (6th Cir. 2010)).

fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment."). Doe has not alleged that he or his children were denied access to state courts because of Doe's disability.

The claims raised in *Popovich I* also concerned plaintiff's ability to participate fully in court proceedings. *See* 276 F.3d at 811. The plaintiff in *Popovich I* was "a hearing-impaired person [who] brought an action in federal court under Title II against a state court for allegedly failing to provide him with adequate hearing assistance in his child custody case." *Id.*; *see also id.* at 813 ("The general claim is that the state court in a child custody proceeding denied the partially deaf plaintiff a reasonable way to participate meaningfully in the proceeding so that he could assert his child custody rights."). The Sixth Circuit, sitting en banc, concluded that the ADA's abrogation of sovereign immunity was valid with respect to the plaintiff's Title II claim because "a father seeking to force the state to provide him with hearing assistance for use in a state judicial proceeding determining his custody rights with respect to his daughter" "raises obvious due process concerns which Congress has the authority to address under Section 5." *Id.* at 815. Again, however, Doe has not claimed that he or his children were denied the right to meaningfully participate in child custody proceedings because of Doe's disability.

Doe's claims are that state actors discriminated against him—and, by association, his children—on the basis of his diagnosed depression in the substantive decisions made in the course of his child custody proceedings and deprived him and his children of fundamental rights on that basis. (Doc. No. 23.) Neither *Lane* nor *Popovich I* dictates that the ADA's abrogation of sovereign immunity is valid in this context. The Court therefore must apply the *Georgia* test to determine whether Congress has validly abrogated Tennessee's sovereign immunity from these claims against Monsue, the General Sessions Court, Wolfe, the Chancery Court, and the State.

24

### 2. Doe's Claims Against Monsue and the General Sessions Court

Monsue and the General Sessions Court argue, as a threshold matter, that Monsue's alleged actions fall outside the scope of the ADA. (Doc. No. 151.) They cite two state court opinions to support this conclusion, one from the Supreme Court of South Dakota, *Arneson v. Arneson*, 670 N.W.2d 904, 911 (S.D. 2003) ("[N]o authority supports the extension of the ADA into parental custody disputes."), and one from the Court of Appeals of Mississippi, *Curry v. McDaniel*, 37 So.3d 1225, 1233 (Miss. Ct. App. 2010) ("[W]e find no persuasive authority which supports the proposition that the ADA applies or was intended to apply to child-custody determinations." (citing *Arneson*, 670 N.W.2d at 911)). (Doc. No. 151.) These decisions carry little weight in this Court's analysis. Federal courts are not required to accord any deference to state courts' interpretations of federal law. *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 455 (6th Cir. 2007). Rather, state courts' decisions on issues of federal law are "at most non-binding, persuasive authority, which [federal courts] are free to follow or to reject, depending on [their own] interpretation of . . . federal law." *Commodities Export Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 528 (6th Cir. 2012).

*Arneson*'s and *Curry*'s holdings regarding the scope of the ADA are unpersuasive on their merits. First, the Sixth Circuit applied the ADA to state-court child custody proceedings in *Popovich I*. 276 F.3d at 815. Second, the ADA's accompanying regulations expressly provide that "Title II coverage . . . includes activities of the . . . judicial branches of State and local governments." 28 C.F.R. pt. 35, app. B. And the Sixth Circuit has broadly construed "the phrase 'services, programs, or activities'" as used in Title II to "encompass[ ] virtually everything that a public entity does." *Johnson*, 151 F.3d at 569; *Babcock*, 812 F.3d at 540 (quoting *id.*). Further, as Doe argues, the U.S. Department of Justice (DOJ) and Department of Health and Human Services (HHS) take the position that Title II's prohibition on discrimination in services, programs, or

activities of public entities "extend[s] to child welfare hearings, custody hearings, and proceedings to terminate parental rights." U.S. Dep't of Health and Hum. Servs., Off. for Civ. Rights Admin. for Child. and Families & U.S. Dep't of Just., Civ. Rights Div. Disability Rights Section, *Protecting the Rights of Parents & Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* at 3 (Aug. 2015), https://www.hhs.gov/sites/default/files/disability.pdf.

At step one of the *Georgia* analysis, the Court must "determine which aspects, if any, of defendants' alleged conduct violated Title II."[5] *Babcock*, 812 F.3d at 535. Doe's amended complaint alleges that, on Jane Doe's petition, Monsue issued an ex parte protective order prohibiting Doe from any contact with Jane Doe or the Doe children pending a hearing. (Doc. No. 23.) Jane Doe's petition, an excerpt of which Doe attached as an exhibit to his amended complaint, states that Doe "threw [their] son across his bedroom onto his bed following a discipline altercation"; "slapped one of [their] children hard enough to leave marks on his face"; and "threw a bi-fold door at [Jane Doe] and grabbed [her] by the collar nearly lifting [her] off [her] feet."

---

[5]     Monsue and the General Sessions Court argue that Doe has not satisfied the first step of the *Georgia* test—whether Doe has alleged state conduct that violates Title II—because he has not established a prima facie case of discrimination. (Doc. No. 151.) But the Supreme Court has held that "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement" and "it should not be transposed into a rigid pleading standard for discrimination cases." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 512 (2002); *see also Morgan v. St. Francis Hosp.*, No. 19-5162, 2019 WL 5432041, at *1 (6th Cir. Oct. 3, 2019) ("A claimant need not . . . allege facts establishing a prima facie case of disability discrimination to survive a motion to dismiss under Rule 12(b)(6)."). The Court thus applies "the ordinary rules for assessing the sufficiency of a complaint" under Federal Rule of Civil Procedure 8, *Swierkiewicz*, 534 U.S. at 511, and determine whether the factual allegations underlying Doe's Title II claims are "sufficient to give notice to the defendant[s] as to what claims are alleged" and contain "'sufficient factual matter' to render the legal claim[s] plausible, i.e., more than merely possible" *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

26

(Doc. No. 23-1, PageID# 274.) The petition also mentions "[o]ther violence," including Doe throwing Jane Doe to the ground and "placing his arm against [her] neck"; that "[t]he escalation of violence" was "reported to [their] marriage counselor" who recommended that the couple separate; and that, "[a]fter being separated for approximately 1 week, [Doe] threatened suicide." (*Id.*) Jane Doe called 911 and Doe "was ultimately taken to a[n] inpatient psychiatric hospital . . . ." (*Id.*) After Doe was released, he told Jane Doe that he was "on new medication including Lithium [and] Trazadone." (*Id.*) The petition alleges that Doe's "behavior ha[d] begun to escalate again becoming unpredictable" and he had shown up at her and the children's residence without notice and entered without permission. (*Id.*) Jane Doe stated that she was "fearful for [her] children and [herself]" because she "d[id] not know if/when he w[ould] show up at [her] residence and cause harm to [her] and/or [her] children, especially given his recent mental health instability . . . " and that Doe "ha[d] begun calling [their] son[s'] daycare and school to see if they [we]re present" and Jane Doe was "fearful he w[ould] show up . . . , check them out[,] and cause harm to them due to his mental instability." (*Id.* at PageID# 275.) Jane Doe further stated that, if Doe received notice of the petition before the General Sessions Court issued a no contact order, she was afraid that his "erratic behavior [and] violence w[ould] occur/escalate." (*Id.*)

Doe's amended complaint alleges that, during the hearing on the petition before Monsue, Jane Doe's attorney repeatedly mentioned Doe's "mental health diagnosis and medications," compared Doe's depression to "a potentially rabid dog you would not want to let back in the house until you were sure he had been checked out[,]" and called three witnesses to testify about Doe's mental health. (*Id.* at PageID# 253, ¶ 39.) Doe alleges that, "at the conclusion of the protective order hearing, . . . Monsue found the domestic abuse allegations proven by a preponderance of the evidence[ ] and ordered John Doe to have no contact with Jane Doe" and their children. (*Id.* at

PageID# 253, ¶ 43.) "Monsue explicitly stated that he was not making any custody or visitation determinations, deferring to the Chancery Court." (*Id.*)

The General Sessions Court and Monsue do not contest that Doe's depression is a disability within the meaning of the ADA or that Doe has sufficiently alleged a disability for purposes of his ADA claims. These defendants argue, however, that Doe has not adequately alleged that Monsue's actions entering the ex parte no-contact order, holding an evidentiary hearing, and granting Jane Doe's petition for a protective order were discriminatory based on Doe's mental health in violation of Title II. (Doc. No. 151.) Doe responds that Jane Doe's petition cited, and her attorney argued, "John Doe's mental health as THE reason she was scared and needed a protective order." (Doc. No. 153, PageID# 991.) He also argues that "the discriminatory 'no contact' order" was the source of the children's Title II injury. (Doc. No. 142, PageID# 938.)

Construing the amended complaint's allegations in the light most favorable to Doe, the Court finds that Doe has not plausibly alleged that Monsue discriminated against him or his children on the basis of disability. Jane Doe's petition for a protective order alleged physical abuse by Doe against her and the children and referred to Doe's suicide attempt, psychiatric hospitalization, and "mental instability" in relation to those acts and Jane Doe's fear of future harm. (Doc. No. 23-1, PageID# 275.) Doe alleges in the amended complaint that Monsue granted the petition for a protective order because Jane Doe proved her allegations of domestic abuse during the evidentiary hearing. While Doe has also alleged that Jane Doe's lawyer repeatedly argued about and introduced evidence regarding Doe's mental health at the hearing, those allegations do not support a reasonable inference that Monsue discriminated against Doe on the basis of disability in issuing his orders.

28

The fact that Monsue considered evidence regarding Doe's depression in making his determinations, without more, does not support a finding that Monsue violated Title II. A state court's consideration of a plaintiff's disability in determining custody, "standing alone, is not a violation of the ADA." *Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 553 (E.D.N.Y. 2013), *aff'd* 560 F. App'x 6 (2d Cir. 2014). As the DOJ and HHS guidance that Doe attached to his amended complaint recognizes, courts have an obligation "to ensure the safety of children" and, "in some cases, a parent . . . with a disability may not be appropriate for child placement because he or she poses a significant risk to the health or safety of the child that cannot be eliminated by a reasonable modification." DOJ & HHS, *Protecting the Rights of Parents & Prospective Parents with Disabilities* at 5. The critical distinction is that "[p]ersons with disabilities may not be treated on the basis of generalizations or stereotypes." *Id.* at 4. Title II requires that courts determining whether a parent's disability is relevant to the child's health and safety make individualized assessments based on objective facts regarding the nature, duration, and severity of the risk, the probability that a child will actually be injured, and whether any reasonable modifications can mitigate the risk. *Id.*; *see also* 28 C.F.R. § 35.139(b).

Doe has not plausibly alleged that Monsue's actions—issuing the ex parte no contact order based on Jane Doe's petition, holding an evidentiary hearing, and granting Jane Doe's petition for a protective order—were based on generalizations or stereotypes about Doe's depression or otherwise violated Title II. To the contrary, Doe has alleged that Monsue based his actions on individualized considerations, including Jane Doe's allegations and evidence of Doe's physical abuse. Because Doe has not plausibly alleged that Monsue discriminated against him or his children or excluded them from participation in or denied them the benefits of the services, programs, or activities of the General Sessions Court by reason of Doe's disability in violation of

29

Title II, the remaining claims in Counts 6 and 7 against Monsue and the General Sessions Court do not satisfy step one of the *Georgia* analysis.

If a court determines that a plaintiff "failed to state an ADA claim" at step one of the *Georgia* analysis, "it need not" "and should not" consider the constitutional questions posed by steps two and three—whether the alleged conduct also violates the Fourteenth Amendment and, if the conduct violates Title II but not the Fourteenth Amendment, whether Congress's abrogation of sovereign immunity is nevertheless valid with respect to the plaintiff's claims. *Zibbell v. Mich. Dep't of Hum. Servs.*, 313 F. App'x 843, 847 (6th Cir. 2009); *see also id.* at 847–48 ("[U]nder *Georgia*, the constitutional question—abrogation of Eleventh Amendment immunity—will be reached only after finding a viable claim under Title II." (quoting *Haas v. Quest Recovery Servs., Inc.*, 247 F. App'x 670, 672 (6th Cir. 2007))). Failure to identify conduct that violates Title II at step one of the *Georgia* analysis is dispositive because, "[w]ithout identifying ADA-violating conduct," a court cannot find "that Congress abrogated the states' sovereign immunity by a valid exercise of its power under § 5 of the Fourteenth Amendment." *Babcock*, 812 F.3d at 539. Further, although the General Sessions Court and Monsue argued that Doe's and his children's claims in Counts 6 and 7 also fail to satisfy the second and third steps of the *Georgia* test (Doc. No. 151), Doe has not responded to these arguments.

For these reasons, the Court finds that Congress has not validly abrogated sovereign immunity with respect to Doe's and his children's Title II claims for monetary damages against Monsue and the General Sessions Court in Counts 6 and 7. Sovereign immunity therefore bars the Court's consideration of these claims.

### 3.     Doe's Claims Against Wolfe, the Chancery Court, and the State

The State, the Chancery Court, and Wolfe argue that Wolfe's actions fall outside the scope of the ADA, relying on the South Dakota Supreme Court's decision in *Arneson* and the Mississippi

30

Court of Appeals's decision in *Curry*. This argument is unpersuasive for the reasons stated above. The Court must therefore consider whether Wolfe's alleged conduct violated Title II under the first step of the *Georgia* analysis.[6]

The amended complaint alleges that, after filing for divorce in the Chancery Court, Doe petitioned the Chancery Court to review the General Sessions Court's protective order and moved for his own protective order, but the Chancery Court and Wolfe took no action on those filings. (Doc. No. 23.) Jane Doe filed a proposed parenting plan that would require Doe to undergo "'a full psychological evaluation'" and "'disclos[e] to [Jane Doe] and the [Chancery] Court [ ] all treatment, diagnoses, medications, and documentation pertaining to [Doe's] physical and mental health'" before allowing Doe supervised visitation with the Doe children. (*Id.* at PageID# 252, ¶ 38.) Doe moved for a temporary custody and visitation order and filed a notice of disability under the ADA informing the Chancery Court that he had been diagnosed with major depression and asking the Chancery Court and Wolfe not to discriminate against him. (Doc. No. 23.) Doe attached the DOJ and HHS guidance regarding application of the ADA to state-court custody proceedings to the notice. (Doc. Nos. 23, 23-1.)

Doe alleges that Wolfe held a hearing in the Chancery Court on April 24, 2018, at which the parties discussed temporary visitation, among other things. (Doc. No. 23.) Doe alleges that Wolfe and Jane Doe's attorney "had an odd, seemingly mocking exchange regarding [Doe's] notice of disability and request for protection under the ADA." (*Id.* at PageID# 255, ¶ 53.) "Wolfe, without ruling, . . . set aside John Doe's motion challenging the appropriateness, under state law,

---

[6] Like the General Sessions Court and Monsue, the State, the Chancery Court, and Wolfe also argue that Doe has not satisfied the first step of the *Georgia* test because he has not established a prima facie case of discrimination. (Doc. No. 140.) This argument fails for the reasons already stated.

of the 'no contact' provision affecting the minor children and the A.D.A. notice." (*Id.* at PageID# 255, ¶ 55.) "[T]he parties were ready to proceed with an evidentiary temporary visitation hearing . . . ," but Wolfe ordered the appointment of a guardian ad litem and adjourned the hearing to allow the guardian "to become familiar with the case[.]" (*Id.* at PageID# 255, ¶ 54.) "Wolfe then directed the parties to the hallway to negotiate supervised visitation." (*Id.* at PageID# 255, ¶ 56.)

As a result of these negotiations, "Jane Doe's sister and brother-in-law were designated the supervisors" for Doe's two-hour visits with his children every other week. (*Id.*) "John Doe tried to object, when the case was recalled, asking [Wolfe] to appoint neutral supervisors" because "Jane Doe's sister had testified against [Doe] at the protective order hearing[,]" but Wolfe said that the Chancery Court was not going to make a visitation decision that day "and that John Doe was only going to get . . . visitation by agreement of the parties." (*Id.* at PageID# 255–56, ¶¶ 56, 57.) "Wolfe then ordered a Rule 35 mental health evaluation for John Doe and a family evaluation as well." (*Id.* at PageID# 256, ¶ 57.)

Doe underwent a mental health evaluation at Vanderbilt University Medical Center at his own expense, and the evaluation report was filed with the Chancery Court in early July 2018. (Doc. No. 23.) Doe alleges that the evaluation concluded that "Doe's medication and treatment should be mitigating anger and depression issues, and recommended that [ ] Doe not consume alcohol, especially given the medications [ ] Doe [was] taking." (*Id.* at PageID# 256–57, ¶ 62.) Doe moved for another temporary visitation hearing, and Wolfe held a hearing on August 10, 2018. (Doc. No. 23.) Doe alleges that, during the hearing, Wolfe "stated his disregard of the Americans with Disabilities Act, as it applies to [divorce and custody] proceedings, until some 'other Tennessee Court says it applies.'" (*Id.* at PageID# 257, ¶ 65.) Wolfe also "waived the Rule 35 Mental Health evaluation around and said John Doe's *diagnoses* concerned him and indicated John Doe would

have to show he was not a danger to the children." (*Id.* at PageID# 257, ¶ 67.) Doe states that Wolfe was openly dismissive of Doe, refused to hear from Doe's witnesses, and adjourned the hearing pending the results of the family evaluation "so he [would] ha[ve] another potential recommendation regarding John Doe's mental health[.]" (*Id.* at PageID# 257–58, ¶¶ 66, 68, 70.) Wolfe also ordered Doe to hire a professional visitation supervisor at his own expense. (Doc. No. 23.) From these allegations, Doe asserts that Wolfe and the Chancery Court acted "based on the prohibited rationale of stereotypical and unspecified fear relative to his mental health diagnosis," violating his and his children's rights under Title II. (*Id.* at PageID# 267–268.)

The State, the Chancery Court, and Wolfe do not contest that Doe is disabled within the meaning of the ADA because of his depression or that Doe has sufficiently alleged a disability for purposes of his Title II claims. Instead, these defendants argue that Doe has not sufficiently alleged that he is a qualified individual with a disability, as required by Title II, because he has not alleged that he met the essential eligibility requirements for Wolfe to enter Doe's proposed temporary custody and visitation order. (Doc. No. 140.) The State, the Chancery Court, and Wolfe further argue that Doe has not sufficiently alleged that Wolfe improperly considered Doe's mental health in determining custody and visitation or otherwise discriminated against Doe or his children on the basis of Doe's depression. (*Id.*) Doe argues that he has sufficiently alleged a Title II violation because, "in light of Doe's disability," Wolfe "would not restore" his contact with his children "with a temporary order and would not even provide Doe a proper temporary hearing." (Doc. No. 142, PageID# 937.)

Doe's amended complaint alleges that, because Jane Doe did not file a proposed temporary parenting plan, Wolfe and the Chancery Court should have entered Doe's proposed plan by default under Tennessee Code Annotated § 36-6-403(2). (Doc. No. 23.) The Court liberally construes this

as an allegation that Doe was otherwise qualified for entry of his proposed temporary order. However, as the State, the Chancery Court, and Wolfe argue in their supplemental brief (Doc. No. 140), § 36-6-403(2) provides that

> [i]f only one (1) party files a proposed temporary parenting plan in compliance with this section, that party may petition the court for an order adopting that party's plan by default, upon a finding by the court that the plan is in the child's best interest.

Tenn. Code Ann. § 36-6-403(2). Doe has not alleged that Wolfe or the Chancery Court found that Doe's proposed temporary order was in his children's best interest. The statute thus does not provide a basis for finding that Doe was otherwise qualified for entry of the parenting plan.

More importantly, the amended complaint does not plausibly allege that Wolfe's consideration of Doe's depression violated Title II. Again, the ADA does not impose a blanket prohibition on considering a parent's disability in making child custody determinations. *See Schweitzer*, 935 F. Supp. 2d at 553. Under the DOJ and HHS guidance on which Doe relies, courts making child custody determinations may consider a parent's disability so long as they do so "on a case-by-case basis consistent with facts and objective evidence" and not "on the basis of generalizations and stereotypes." DOJ & HHS, *Protecting the Rights of Parents and Prospective Parents with Disabilities* at 4.

The amended complaint alleges that Wolfe allowed Doe temporary supervised visitation with his children as negotiated by the parties. (Doc. No. 23.) It further alleges that Wolfe ordered Doe to undergo a Rule 35 mental health evaluation and ordered the Does and their children to undergo a family evaluation. (*Id.*) After reviewing Doe's mental health evaluation, Wolfe stated that he was still concerned about Doe's diagnoses, that Doe would have to show he was not a danger to the children, and that Wolfe would wait until the family evaluation was completed before deciding visitation and custody because he wanted additional information about Doe's mental health. (*Id.*) These facts do not plausibly allege that Wolfe treated Doe on the basis of

34

generalizations and stereotypes. Quite the opposite. Wolfe ordered two individualized assessments—the Rule 35 mental evaluation and the family evaluation—to assist him in making his decision. That Wolfe remained concerned about the effect of Doe's depression on the children after reading the mental health evaluation and sought additional information from the family evaluation does not lead to a plausible inference that Wolfe acted on the basis of generalizations or stereotypes about Doe's mental health.[7]

Doe has not plausibly alleged that Wolfe discriminated against him or his children or excluded them from participation in or denied them the benefits of the services, programs, or activities of the Chancery Court by reason of Doe's mental health disability in violation of Title II. Doe's claims against Wolfe, the Chancery Court, and the State in Counts 6 and 7 thus do not satisfy step one of the *Georgia* analysis. Congress has not validly abrogated sovereign immunity with respect to Doe's and his children's Title II claims for money damages against Wolfe, the Chancery Court, and the State in Counts 6 and 7, and sovereign immunity therefore bars the Court's consideration of these claims.

## IV.    Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the Court find that sovereign immunity bars consideration of Doe's and his children's claims for monetary damages in Counts 6 and 7 of the amended complaint against each of the remaining defendants and that these claims be DISMISSED WITHOUT PREJUDICE.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt

---

[7]    Doe's amended complaint does not include any allegations regarding the results of the family evaluation.

of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 15th day of August, 2022.

ALISTAIR E. NEWBERN
United States Magistrate Judge